UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| LIZ LORENA LOPEZ MORENO<br>Petitioner,<br>-v-<br>JASON MICHAEL ZANK,<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:17-cv-732<br><br>Honorable Paul L. Maloney |

## OPINION

Petitioner Liz Lorena Lopez Moreno filed this action against Respondent Jason Michael Zank on August 14, 2017, seeking immediate return of their minor child ("BLZ") to Ecuador, under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001, *et seq.* Liz contends that Jason wrongfully retained BLZ after a trip to Michigan in the Summer of 2016 because his retention of the child allegedly violated an Ecuadoran court order from 2014. Therefore, she says that BLZ must be returned to Ecuador. As will be explained, the Court finds that Liz has not established a prima facie case of wrongful retention under the Convention. Thus, the Court will deny the Petition.

### Procedural Posture

Liz filed the relevant petition on August 14, 2017. Jason answered on September 14, 2017. The Court determined that an evidentiary hearing was necessary and held a two-day hearing over September 28–29, 2017. After the hearing, the parties filed simultaneously

closing briefs and reply briefs. The Court has reviewed the written submissions and determined that no further briefing or oral argument is necessary for resolution of the Petition.

## Findings of Fact

The Court makes the following findings of fact:

Liz Lorena Lopez Moreno is a citizen of Ecuador, and Jason Zank is a citizen of the United States. Liz came to the United States on an education visa as an exchange student in the early 2000s. They began a romantic relationship, culminating in their marriage in Michigan in 2003. BLZ was born to Jason and Liz in Greenville, Michigan in 2006 and is now 11 years old.

Jason and Liz's relationship deteriorated, and Jason filed for divorce in Montcalm County Court in December of 2008. The divorce was finalized in July of 2009. As part of the divorce decree, the Montcalm County Court ordered Liz and Jason to share joint legal and physical custody of BLZ and ordered the parties to alternate weekly custody, with additional visitation twice a week for each parent. The divorce decree also allowed Liz to visit Ecuador with BLZ with 60 days advance notice to Jason.

One Sunday in December of 2009, Liz failed to return BLZ to Jason at the ordinary time. Jason contacted his attorney and law enforcement. He also notified the United States Embassy because he was concerned that Liz had left the country. He was right. Liz had absconded with BLZ and returned to Ecuador in violation of the Montcalm County divorce decree and child custody order. Approximately five days later, Jason sought and received an ex parte order from the Montcalm County Court, temporarily granting him sole legal and

physical custody of BLZ until a full hearing could be held. Soon after, Jason contacted the United States State Department, Office of Children's Issues to begin the process of returning BLZ to the United States. He then completed a Hague petition with the United States Embassy in Ecuador. (Resp's Ex. E-1, Hague Pet.) However, Jason encountered "difficulties" going through the Hague Convention process. He testified that "[he] thought [he] got the runaround nonstop . . . [the United States Embassy in Ecuador] could never provide us with good answers . . . it's like they weren't sure how to handle the situation. (ECF No. 12 at PageID.138.) At the evidentiary hearing, the Court admitted into evidence a report authored by the State Department indicating that Ecuador has been cited as non-compliant with the Hague Convention procedures since 2014, lending credibility to Jason's own experiences with the Ecuadoran government through 2009 and 2010. (*See* Resp's Ex. C, Department of State, *Annual Report on International Child Abduction* (2017)). The non-action of the petition stymied Jason's progress, and although he asked a couple attorneys around town some questions, he did not continue to pursue the Hague petition through 2010.

Meanwhile, Liz was settling back in to life in Ecuador with BLZ. She testified that she obtained an order from a court in Ecuador in February of 2010 that prevented BLZ from leaving the country. (ECF No. 12 at PageID.247.) As BLZ grew up, she was enrolled in a prestigious private school in Ecuador, and Liz and Liz's parents arranged for further instruction with a private tutor. BLZ also expressed interest in a wide variety of social and extracurricular activities and participated in a number of them. (ECF No. 12 at PageID.237.)

A few months after taking BLZ, Liz began allowing Jason to communicate with BLZ via telephone or Skype, and the relationships between Jason and Liz's families improved. In

September of 2010, Jason's parents, Julie ("Ms. Zank") and Mike Zank, visited BLZ in Ecuador. They stayed with Liz's mother and her husband, Fernando. Ms. Zank testified at the evidentiary hearing that when they would visit BLZ, they were required to surrender their passports to Fernando (ECF No. 12 at PageID.185), presumably to prevent the Zanks from trying to leave the country with BLZ.

In March of 2011, Jason made his first trip to Ecuador to see BLZ with his parents. (ECF No. 12 at PageID.170.) They stayed with Fernando for part of the week and spent the remainder at a resort in another area of Ecuador. Jason's parents continued making yearly trips to Ecuador to spend time with BLZ, and Jason made about five trips to Ecuador between 2011 and 2016. While in Ecuador, Jason never attempted to go to the authorities or otherwise revive his efforts to return BLZ to the United States.

One of Jason's other trips to Ecuador occurred in the summer of 2014, but this trip was different. Jason claims that Liz told him that, if he wanted to remain part of his daughter's life, he would sign an agreement with her, granting her full custody of BLZ. (*Id.* at PageID.143). In exchange, Liz would allow BLZ to visit Jason in the United States. Liz disputes his account. According to her, the communication between them was getting better, and they agreed to an arrangement that would be in BLZ's best interest. She said, "In 2014 after a couple of days when Jason was visiting with [his parents] with my daughter, I sat with him to talk[,] both of us alone. And we reached this agreement. He wrote what he wanted, I wrote what I wanted, and we reach[ed] an agreement that I would not talk bad about him, he wouldn't talk bad about me. And that this agreement [was] for the best, or the well-being of my daughter—our daughter." (*Id.* at PageID.223.)

After reaching an agreement, Liz and Jason took it to the Ecuadoran courts. Each side was represented by an attorney, but the Ecuadoran court apparently was not apprised of Liz kidnapping BLZ, the 2009 Montcalm court order, or Jason's Hague petition. The agreement purported to transfer jurisdiction of the case to Ecuador and grant Liz full legal and physical custody of BLZ. Jason's child support payments were also increased from $200 per month to $300 per month. In return, Jason received Liz's permission to have BLZ visit him in the United States over the summer when BLZ was not in school. Jason also "waive[d] pursuing further action arising from the arrival of the minor child into Ecuador, in accordance with American laws." The Ecuadoran court approved the agreement (the "2014 Ecuadoran Order").

After the agreement was signed, BLZ visited Jason and his parents over her Christmas break in 2014 and returned for a second visit in July of 2015. But before BLZ returned in July of 2015, Jason and Liz entered into a second agreement, this time in the United States (the "2015 Stipulation"). Ms. Zank had requested the assistance of attorney Robert Alvarez to put something in writing to memorialize the 2014 Ecuadoran Agreement to protect the Zank family's continued access to BLZ in the United States. (ECF No. 12 at PageID.101–02.) At this time, Alvarez was already representing Liz. Evidently, Alvarez did not regard his representation of Liz to be a problem, because he drafted the requested document and accepted payment from the Zank family. (*Id.* at PageID.155.) On June 24, 2015, Jason and Julie went to Alvarez's office to sign the documents that Alvarez prepared. Jason testified that

he did not sign any type of conflict waiver and was not informed of the risks of Alvarez jointly representing both he and Liz.[1] (*Id.* at PageID.155.)

The documents were submitted to this Court at the evidentiary hearing and admitted into evidence. (*See* ECF No. 16-3). The 2015 Stipulation was intended to be submitted to the Montcalm County Court to inform that court that Liz "shall be awarded sole physical and legal custody of BLZ" and to obtain an order to that effect. (ECF No. 16-3 at PageID.351.) In essence, the 2015 Stipulation was supposed to inform the Montcalm County Court that the parties had stripped it of jurisdiction by consenting to the proceedings in Ecuador. However, the caption of the 2015 Stipulation lists Kent County and the address of the Kent County Court, and there is no indication that the Montcalm County Court ever actually received the stipulation. (ECF No. 12 at PageID.106.)

After the 2015 Stipulation was signed, BLZ came to visit the Zank family in Michigan in July of 2015. She returned to Ecuador without issue at the end of August.

Jason and Liz again arranged for BLZ to spend the summer in Michigan in 2016. They agreed that BLZ would travel to Michigan after she finished her school year in July, and would remain with Jason until she was to go back to school in the middle of August. They further planned for BLZ to meet Fernando in Florida to go to Disney World before

---

[1] Frankly, the Court finds Mr. Alvarez and Ms. Grauman's conduct to push the boundaries of ethical representation. By representing both parties to the 2015 Stipulation and subsequently representing Liz in this matter, it would appear to the Court that Alvarez and Grauman created significant conflicts of interest. *See* Michigan Rules of Professional Conduct 1.7, 1.9. However, the focus of the evidentiary hearing was on the merits of Liz's Hague Petition. Further inquiry into any violation of the Michigan Rules of Professional Conduct is within the jurisdiction of the State Bar of Michigan.

6

returning to Ecuador. Jason was supposed to put BLZ on a plane to Florida on August 10, 2016. However, Liz testified that she received a phone call from BLZ on August 5, 2016. She said that "[i]t was horrible. [BLZ] called me, it was a very fast conversation. She told me her dad, her grandparents and his family have told her the entire truth about our divorce, that I was a drug user, that I had taken her from [the United States] to come [to Ecuador] and not to see her dad. She was thoroughly poisoned." (ECF No. 12 at PageID.234.) Liz further testified that she asked if BLZ didn't want to come back and if she didn't want to go to Disney. BLZ told her that she didn't know and hung up. (*Id.*) Five days later, there was a problem with the Delta flight from Michigan to Florida, and BLZ remained with Jason. Jason also did not put BLZ on her flight back to Ecuador on August 15, 2016.

Liz began the Hague Petition process in Ecuador on August 24, 2016 after not hearing from Jason. On October 31, 2016, Jason sought an order from the Montcalm County Court awarding him full custody of BLZ. Liz did not appear. The notice was sent to Liz's old Michigan address, although Jason claimed to have informed that court that Liz lived in Ecuador, but also that he didn't know her exact address. In the briefing, Jason faults Liz for not keeping the Montcalm County Court apprised of her address, and Liz faults Jason for not tracking down her new address and supplying it to the court. Jason also testified that he may have mentioned the 2014 Ecuadoran Court Order in the 2016 proceedings but that he did not have a copy of the order and did not know its exact terms. The Montcalm County Court granted Jason full custody of BLZ.

BLZ remains in Jason's custody in Greenville, Michigan and has now begun her second year of schooling in the United States. She is in sixth grade.

7

## Legal Framework

Both the United States and Ecuador are signatories to the Hague Convention, which seeks "(1) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Conv., art. 3. The Convention aims to deter "the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child." Elisa Perez-Vera, Explanatory Report, P. 11, 3 *Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session*, Child Abduction 426, 428 (1982).[2] In other words, "the primary purpose of the Hague Convention is to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (hereinafter "*Friedrich I*").

When deciding an action brought under the Hague Convention, a federal court has subject matter jurisdiction to decide "the merits of an abduction claim . . . not the merits of the underlying custody claim." *Id.* (citing Hague Conv., art. 19).

Under ICARA, the petitioner has the burden of proving by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the

---

[2] Elisa Perez-Vera was the official Hague Conference reporter. *Mozes v. Mozes,* 239 F.3d 1067, 1070 (9th Cir. 2001). The Hague Convention recognizes the Perez-Vera report "as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10503 (1986).

[Hague] Convention." 22 U.S.C. § 9003(e)(1)(A). The removal or the retention of a child is to be considered wrongful where—

> [I]t is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention . . . .

Hague Conv., art. 3. Therefore, the Court must determine whether Petitioner has proven the following elements by a preponderance of the evidence:

1. Whether the child was habitually resident in another country before the allegedly wrongful removal or retention;

2. Whether the removal or retention was a breach of custody rights under the laws of the country where the child was habitually resident;

3. Whether the Petitioner was exercising custody rights at the time of the removal or retention; and

4. Whether the child is under the age of 16.

If the Petitioner meets that burden, the burden shifts to the Respondent to show that one of the following narrow exceptions applies such that the child should not be returned:

> 1) that the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment. Hague Conv., art. 12;

> 2) the Petitioner had consented or acquiesced in the removal or retention. Hague Conv., art. 13a;

3) there is a grave risk that return of the child would expose the child to physical or psychological harm. Hague Conv., art. 13b;

4) returning the child would violate fundamental principles relating to the protection of human rights and fundamental freedoms. Hague Conv., art. 13b; or

5) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of his or her views

Hague Conv., art. 12, 13a, and 13b; *Friedrich* I, 983 F.2d at 1400.

## Conclusions of Law

The Court must first determine BLZ's habitual residence to determine whether Jason violated the Hague Convention when he retained her in August of 2016. Unfortunately, neither the Convention nor ICARA offers a definition of the phrase "habitual residence." Neither has the Supreme Court opined on its meaning. However, the Sixth Circuit has dealt with the concept on several occasions, and its insights will guide the Court.

A person can have only one habitual residence. *Friedrich I*, 983 F.2d at 1401. Habitual residence should not be mistaken as an alternative term for the legal concept of domicile. *Id.* A determination must focus on past experience, not future intentions. *Id.* In a departure from other Circuits, the subjective intent of the child's parents is irrelevant in the Sixth Circuit. Instead, "habitual residence can be 'altered' only by a change in geography and the passage of time. . . . **The change in geography must occur before the questionable removal.**" *Id.* (emphasis added).

In other cases, the Sixth Circuit has instructed that trial courts should consider a child's habitual residence to be "the nation where, at the time of [a wrongful removal or retention], the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective." *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007)). The Court is further guided by consideration of a number of factors:

> [A]cademic activities are among the most central . . . in a child's life and therefore highly suggestive of acclimatization. The court also noted that social engagements, participation in sports programs and excursions, and meaningful connections with the people and places in the child's new country all point to the child being acclimatized.

*Roberts*, 507 F.3d at 996. At the evidentiary hearing, the Court heard a great deal of testimony involving BLZ's academic studies and social involvement both in the United States and Ecuador. BLZ was enrolled in a private school in Ecuador and had regular sessions with a tutor. She was also participating in extracurricular activities and making other meaningful connections with friends and family in Ecuador. In sum, the Court concludes that, having lived in Ecuador from the time she was 3 years old until she was 10, she had been acclimatized to Ecuador and was settled there.

However, a fundamental purpose of the Hague Convention is to "deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich* I, 983 F.2d at 1400. Accordingly, the removal of a child without the knowledge or consent of the other parent cannot alter the child's habitual residence. *Id.* at 1401 (concluding that the Convention would be "rendered meaningless" and "create an open invitation for all parents to abduct their children" if wrongful removals could alter habitual residence).

Other circuits agree that "[a] parent cannot create a new habitual residence by wrongfully removing and sequestering a child." *Miller v. Miller*, 240 F.3d 392 (4th Cir. 2001) (quoting *Diorinou v. Mezitis*, 237 F.3d 133, 141–42 (2d Cir. 2001)); *see also Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006) (concluding that wrongful removal and sequestering cannot create a new habitual residence because it would "invite abduction"); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995) (concluding that the Hague Convention does not "reward an abducting parent").

Accordingly, BLZ's habitual residence cannot be Ecuador, because Liz abducted BLZ in violation of Michigan law and brought her there in 2009. The fact that Liz immediately obtained an order from an Ecuadoran court forbidding BLZ from leaving the country is further proof that Liz crossed an "international boundary in search of a more sympathetic court." *Friedrich I*, 983 F.2d at 1400. Therefore, because BLZ was not habitually resident in Ecuador, her habitual residence remained the United States, where she was born and raised until she was kidnapped by Liz in 2009.

Having determined that BLZ's habitual residence to be the United States, the Court must now determine whether Jason's retention of BLZ in 2016 was a breach of Liz's custody rights as determined by the laws of the United States. There are three documents or court orders that could plausibly alter the status of custody over BLZ. In 2009, Jason was awarded temporary full legal and physical custody after Liz left the United States with BLZ. In 2014, an Ecuadoran court purported to take jurisdiction over the custody dispute pursuant to a stipulation by the parties and granted Liz full custody of BLZ. In 2015, the parties entered into a second stipulation, to be filed with the Montcalm County Court that Ecuador would

assume jurisdiction over all future custody disputes and that Liz would take full custody of BLZ.

If either the 2014 Ecuadoran Order or 2015 Stipulation are given legal effect under the laws of the United States, then Jason's retention of BLZ violated the Hague Convention. However, the Court concludes that Montcalm County had exclusive and continuing jurisdiction over all custody disputes involving BLZ under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), and that the individual parties cannot stipulate their way into the subject matter jurisdiction of another court. Therefore, neither the 2014 Ecuadoran Order nor the 2015 Stipulation could modify the existing child custody order of the Montcalm County Court.

Montcalm County acquired exclusive jurisdiction over all child custody disputes relating to BLZ once it made its first custody determination as part of the divorce decree in July of 2009. *See* MCL 722.1202(1).

Under the UCCJEA, jurisdiction is "continuing" until one of a few things happens. The Montcalm County court must either: (1) determine that neither the child nor the child and one parent have a significant connection with Michigan and that evidence is no longer available in Michigan concerning the child's care, protection, training, and personal relationships; or (2) a Michigan court or court of another state determined that neither the child nor a parent of the child presently resided in Michigan. MCL 722.1202(1)(a)–(b). The Court could also relinquish jurisdiction if it determined that it was an inconvenient forum. MCL 922.1202(b)(2).

None of these things happened. At all times from 2009 to 2016, Montcalm County retained jurisdiction because Jason remained a Michigan resident. *See Jamil v. Jahan*, 760 N.W.2d 266, 271 (Mich. Ct. App. 2008) (holding that if either parent to a child remains in the home state, the original court within the home state retains jurisdiction under the UCCJEA). To date, Montcalm County has not made a determination that it no longer has jurisdiction. Accordingly, it remained the exclusive and continuing court of jurisdiction for matters involving Jason and Liz's respective custody rights of BLZ.

In light of Montcalm County's continuing jurisdiction, it is clear that the 2014 Ecuadoran Order cannot be enforced. The UCCJEA governs subject matter jurisdiction over child custody disputes. MCL 722.1201. Subject matter jurisdiction can be thought of as the authority or empowerment of a particular court to do a particular thing. *E.g., In re Knox*, 660 N.W.2d 777 (Mich. Ct. App. 2003) ("Subject matter jurisdiction pertains to the court's abstract power over a class of cases . . . ." (internal quotations omitted)). Here, the only court that was empowered or authorized to modify Liz and Jason's child custody arrangement was the Montcalm County Court, which was authorized by the UCCJEA.

Further, it is widely accepted that parties cannot stipulate to the subject matter jurisdiction of a particular court. *See, e.g., In re Hatcher*, 505 N.W.2d 834, 838 (Mich. 1993) ("[S]ubject matter jurisdiction cannot be conferred on the court by the consent of the parties."). Within the UCCJEA context, one of the official comments to the model version of the UCCJEA makes it clear that "since jurisdiction to make a child custody determination is subject matter jurisdiction, an agreement of the parties to confer jurisdiction on a court

that would not otherwise have jurisdiction under this Act is ineffective." UCCJEA § 201 cmt. 2.

Therefore, when Liz and Jason sat down and hashed out a modification of their child custody arrangement and took it to an Ecuadoran court for ratification, it had no legal effect. The Ecuadoran court lacked jurisdiction. Under ICARA, courts of the United States are ordinarily required to accord full faith and credit to foreign judgments relating to Hague Convention petitions as a matter of comity. 22 U.S.C. § 9003(g). However, it is clear that the Ecuadoran court never viewed the matter as a Hague Petition. It instead treated the case like an ordinary child custody dispute—not one involving wrongful removal of children across international borders. It also lacked subject matter jurisdiction, as noted above, and therefore could not issue an order modifying Liz and Jason's custody arrangement. And even if that court had subject matter jurisdiction, the Court credits Jason's account of the "negotiations" that led to the 2014 Ecuadoran Order. The Court concludes that he was coerced into making the agreement when Liz threatened to cut off all access to BLZ if he did not submit to her demands. This is corroborated by the increase in child support payments, and it excuses his failure to notify his Ecuadoran attorney or the Ecuadoran court of the true circumstances of the custody dispute. Accordingly, the 2014 order had no legal effect and cannot provide the basis for a breach of custody rights.

The 2015 Agreement is also void because "contract principles do not govern child custody matters."[3] *Phillips v. Jordan*, 614 N.W.2d 183, 188 (Mich. Ct. App. 2000). In

---

[3] As the Court indicated previously, everything about the 2015 Stipulation is deeply troubling. While the record was not fully developed on this point, the testimony indicates

15

Michigan, the courts have a duty to review proposed changes in child custody to determine whether the changes would be in the best interests of the child. MCL 722.27(1)(c). The Courts may not "blindly accept the stipulation of the parents, but must independently determine what is in the best interests of the child." *Id.* (citing *Lombardo v. Lombardo*, 507 N.W.2d 788 (Mich. 1993)). There is no indication that Montcalm County ever considered the 2015 Stipulation, let alone that it determined it to be in the best interests of the child. Accordingly, Jason's retention of the child could not breach Liz's custody rights created by the 2015 Stipulation because it is a legal nullity.

Therefore, the Court determines that the 2009 Montcalm County court order awarding Jason temporary custody of BLZ pending a full hearing on the matter has remained effective at all times. Jason did not wrongfully retain BLZ when he did not put her on a flight back to Ecuador in August of 2016. Accordingly, Liz cannot make a prima facie case for BLZ under the Convention.[4] Therefore, her Petition will be denied. Any further child custody proceedings relating to BLZ must be brought with the Montcalm County Court for as long as it retains exclusive and continuous jurisdiction over the action.

---

that Alvarez's firm accepted payment from Julie and Jason Zank—who even at the time were adverse to his client, Liz Lopez Moreno—to draft a document that he knew or should have known could have no legal effect, given the holdings of *Phillips* and *Lombardo*. Further, there is no indication that the document *was even filed* with the Montcalm County Court. Apart from the significant ethical conundrum the case appears to present, there is a second question—whether Alvarez and Grauman met the standard of care when they drafted a legal nullity, at the behest of an adverse party, and then failed to file it with the intended court.

[4] Because the Court concludes that Liz has not met her burden, the Court declines to rule on whether Jason's affirmative defenses would prevent an order for BLZ's return to Ecuador.

There is one last matter that requires the Court's attention. In his briefing, Jason asked to be awarded with attorney's fees and costs, should he prevail on the petition. However, the text of ICARA allows only a prevailing *petitioner* to recover costs. 22 U.S.C. § 9007. Jason is the respondent. While he argues that "the district courts are accorded broad discretion in awarding costs and fees," a review of the case law from around the country confirms that prevailing respondents are not generally entitled to attorney's fees. *See, e.g., White v. White*, 893 F. Supp. 2d 755, 759(E.D. Va. 2012) (collecting cases). Therefore, the Court, in its discretion, declines to award attorney's fees or costs in this matter.

## ORDER

**IT IS HEREBY ORDERED** that Liz Lorena Lopez Moreno's Petition, pursuant to the Hague Convention and International Child Abduction Remedies Act, is **DENIED.**

**IT IS FURTHER ORDERED** that any subsequent disputes of child custody are exclusively within the jurisdiction of the Montcalm County Court, unless and until it or another court determines that it no longer has jurisdiction over the matter under the UCCJEA.

**IT IS SO ORDERED.**

Date:  November 15, 2017                                              /s/ Paul L. Maloney
                                                                                              Paul L. Maloney
                                                                                              United States District Judge