UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LIZ LORENA LOPEZ MORENO, ) | |
| Petitioner, ) | |
| ) | No. 1:17-cv-732 |
| -v- ) | |
| ) | Honorable Paul L. Maloney |
| JASON MICHAEL ZANK, ) | |
| Respondent. ) | |
| ) | |

## OPINION

This matter is before the Court on remand from the Sixth Circuit Court of Appeals for an evaluation of Respondent Jason Michael Zank's defenses against Petitioner Liz Lorena Lopez Moreno's prima facie Hague Convention case. *Moreno v. Zank*, 895 F.3d 917, 926 (6th Cir. 2018). Two defenses have been presented to the Court: Article 12's one-year or now-settled defense and Article 13's mature objector defense. Today, the Court takes up a single question: whether Lopez Moreno filed her Hague petition in this Court within one year of the child's wrongful retention. For the reasons to be explained, the Court finds that she did not. Accordingly, Lopez Moreno is not entitled to the child's automatic return to Ecuador, and the case will proceed for an evaluation of the remainder of Zank's defenses.

I.   Background

The facts of this case have been set out in some detail in both this Court's and the Sixth Circuit's previous opinions. *See generally id.*; ECF No. 19. Given the discrete issue before the Court, only a limited recitation of facts is necessary as background.

The child at issue here, BLZ, was born in 2006 to the parties, who were then married. In 2009, they divorced. The divorce decree granted them joint physical and legal custody of BLZ with alternating custody and visitation for each parent, and it prohibited Lopez Moreno from taking BLZ to Ecuador without prior notice to Zank. But, in December 2009, Lopez Moreno took BLZ to Ecuador in violation of the divorce decree. Relations between the parties were understandably hostile for a time, but eventually Lopez Moreno permitted Zank's parents, and later Zank himself, to visit BLZ in Ecuador. In 2014, Lopez Moreno allowed BLZ to visit Zank in Michigan, which went smoothly. In 2015, a second visit also went well.

Things changed in 2016, when BLZ went to visit Zank for the summer. At the end of their time together, BLZ told Zank that Lopez Moreno had physically abused her by hitting her and throwing a chair at her. BLZ informed Zank that she did not wish to return to Ecuador. In early August, BLZ called Lopez Moreno and, "in a very fast conversation," stated that she had learned the "entire truth" about the divorce, believed that Lopez Moreno "was a drug user," and realized that Lopez Moreno had abducted her to Ecuador. But BLZ did not explicitly say that she would not return to Ecuador during this phone call, and Zank did not communicate with Lopez Moreno at any time after the call.

On August 10, 2016, Zank did not place BLZ on a scheduled flight to Florida to visit Walt Disney World with Lopez Moreno's father, Fernando. BLZ never boarded a flight back to Ecuador, and Zank never called or otherwise contacted Lopez Moreno to inform her that BLZ was not returning.

On August 14, 2017, Lopez Moreno filed this Hague Convention petition (ECF No. 1). Shortly thereafter, this Court heard testimony and received evidence on Lopez Moreno's petition. The Court determined that Lopez Moreno had not established a prima facie case of wrongful retention under the Convention (*See* ECF No. 19). Lopez Moreno appealed that decision and the Sixth Circuit reversed, finding that Lopez Moreno had established a prima facie case of wrongful retention and remanding the case for a first evaluation of Zank's defenses. *Moreno*, 895 F.3d at 926. Since then, the Court has denied Lopez Moreno's first motion for summary judgment (*see* ECF No. 46), and appointed a guardian ad litem for the child (*see* ECF No. 40).

## II.     February 2020 Hearing

This Court held a hearing on February 27, 2020 to hear testimony and take evidence on the limited issue of when BLZ was wrongfully retained in Michigan. The parties stipulated to the following facts: (1) Zank and BLZ had tickets to fly from Grand Rapids to Orlando with a layover in Detroit on August 9, 2016; and (2) an Ecuadorian travel document authorized BLZ to travel to the United States from July 7, 2016 until August 15, 2016. The Court also took judicial notice of a nationwide Delta computer outage issue on August 8, 2016, which caused mass flight cancellations, including Zank's scheduled flight from Detroit to Orlando.

Zank testified that on August 9, 2016, the plan was for Zank to fly with BLZ from Grand Rapids to Detroit, and then from Detroit to Orlando, Florida. In Orlando, Zank would leave BLZ in Fernando's care and Zank would return to Grand Rapids alone. The pair checked their luggage in Grand Rapids and successfully flew to Detroit. However, in

Detroit, they were affected by the Delta outage: the flight to Orlando never occurred. While Zank was trying to figure out how to get back to Grand Rapids and/or reschedule the flight, BLZ told Zank she did not want to return to Ecuador. After reaching a "family decision," Zank determined she would not return (February 27, 2020 Evidentiary Hearing Transcript, ECF No. 74 at PageID.711). This decision led to the phone call: BLZ called Lopez Moreno and said that she did not want to return to Ecuador.[1] Shortly thereafter, Zank notified someone in Lopez Moreno's family (it is unclear whom) that BLZ did not make it to Florida. Zank testified that he did not receive any communications from Lopez Moreno or Fernando after August 9, 2016. Someone—likely either Lopez Moreno or Fernando—contacted Zank's mother, Julie, after August 9.

Zank testified that despite the Ecuadorian travel authorization setting out a return date of August 15, his understanding of the parties' agreement was that his "time [with BLZ] was ending on the ninth." (*Id.* at PageID.713.)

On August 10, 2016, Zank filed a motion for change of custody in Montcalm County Circuit Court. However, Lopez Moreno had not provided the Montcalm County Court with her Ecuadorian address or contact information, and Zank did not include any updated contact information with his motion. Therefore, the motion was never served on Lopez Moreno.

Lopez Moreno testified that after receiving the phone call from BLZ, she immediately began calling everyone in Michigan she could think of; primarily Zank, his mother, and his

---

[1] Testimony at the previous evidentiary hearing placed this phone call on August 5, 2016 (ECF 12 at PageID.234-35). However, on February 27, 2020, both Lopez Moreno and Zank testified that the call took place no earlier than August 9 and no later than August 10 (ECF No. 74 at PageID.739, 741).

4

father. She called "thousands" of times, including every day for the remainder of August, to determine what was going on with BLZ (*Id.* at PageID.743). She articulated fears that Zank would keep BLZ in the United States given the couple's history. At some point shortly after the phone call from BLZ, Lopez Moreno sought advice in Ecuador: she contacted the police, child protective services, and an attorney. All three gave her the same advice: since the Ecuadorian travel authorization listed August 15 as a return date, Lopez Moreno could not act until August 14th or 15th at the earliest, since the child was authorized to be in the United States until then. Lopez Moreno testified that she "hoped" BLZ would come home before school began in September (*Id.* at PageID.745).

Lopez Moreno could not confirm the date that BLZ and Fernando were scheduled to return to Ecuador from Disneyworld, but she did confirm that Fernando was scheduled to take over BLZ's care on August 9, 2016 (*Id.* at PageID.762).

### III. Analysis

Relief under the Hague Convention is only available where there is a "removal or retention of a child . . . in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention." Hague Convention on the Civil Aspects of International Child Abduction, Art. 3, Oct. 25, 1980, T.I.A.S. No. 11,670. The corresponding federal law provides a cause of action for the return of a child where a petitioner establishes that the "child has been wrongfully removed or retained within the meaning of the Convention" 22 U.S.C. § 9003(e)(1). The Sixth Circuit held that Ecuador was BLZ's habitual residence in 2016, so BLZ's removal to the United States was wrongful. *Moreno*, 895 F.3d at 926. Thus, Lopez

5

Moreno has established a prima facie case of wrongful retention. *Id.* The burden is now on Zank to present any applicable affirmative defenses by a preponderance of the evidence. *Id.*; 22 U.S.C. § 9003(e)(2)(B).

> Article 12 of the Hague Convention provides:
>
> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Evaluation of Article 12's one-year or now-settled defense presents the Court with a difficult question: at what point did Zank's retention of the child become wrongful? Lopez Moreno filed her petition on August 14, 2017. If Zank's retention of BLZ became wrongful on or after August 15, 2016, Lopez Moreno's petition was filed within the one-year window and the Court must order the return of BLZ (unless, of course, another defense applies). But if the retention became wrongful on or before August 14, 2016, Lopez Moreno's petition was not timely filed, and the Court must determine whether the child is now settled in the United States. If she is so settled, she may remain; if not, the Court must return her to Ecuador (again, so long as no other defense applies).

Determining the date of wrongful retention is difficult because retention, rather than removal, "cannot easily be reduced to a discrete moment in time." *McKie v. Jude,* Case No. 10-103-DLB, 2011 WL 53058 at *6 (E.D. Ky. Jan. 7, 2011). The parties cite different cases

6

and different tests to determine when retention becomes wrongful, likely because the Sixth Circuit has not yet clearly stated how to pinpoint the date of wrongful retention. Courts in our circuit have applied two tests:

> the time begins to run either (1) from the date the child remains with the abducting parent despite the clearly communicated desire of the left-behind parent to have the child returned, *Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir. 2006); or (2) when the acts of the abducting parent are so unequivocal that the left-behind parent knows or should know, that the child will not be returned, *see Miller v. Miller*, No. 18-CV-86, 2018 WL 4008779, at *13 (E.D. Tenn. Aug. 22, 2018) (collecting cases).

*Diagne v. Demartino*, No. 2:18-CV-11793, 2018 WL 4385659, at *11 (E.D. Mich. Sept. 14, 2018).

However, a close reading of the *Karkkainen* case reveals that it does not stand for the proposition that a left-behind parent must always make a clear statement to the other parent to establish wrongful retention: The Third Circuit specifically stated that it assumed without deciding that standard applied. *Karkkainen*, 445 F.3d at 290. That Court went so far as to say that they were *not* deciding "whether a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody." *Id.* The parties have not brought any cases to the Court's attention that apply this standard without relying on *Karkkainen*, and the Court has not been able to locate any of its own accord. Therefore, this Court declines to employ this test, and will not require a "clearly communicated desire" from Lopez Moreno to determine the date of wrongful retention.

Instead, the Court must examine that date on which Zank's actions were so unequivocal that Lopez Moreno knew or should have known that BLZ would not be returned. *See Miller,* 2018 WL 4008779, at *13 (collecting cases); *Blanc v. Morgan*, 721 F.

7

Supp. 2d 749, 762 (W.D. Tenn. 2010) (holding that the date of wrongful retention was "the first point at which Father was *truly on notice* of Mother's decision not to return or allow [the child] to return") (emphasis added).[2]

Zank's failure to speak to Lopez Moreno at any point in August 2016 complicates this analysis. On this record, there is no conversation that directly demonstrates Zank's unequivocal intent not to return the child. Thus, cases like *Panteleris v. Panteleris*, 601 F. App'x 345, 351 (6th Cir. 2015), are of limited value. In *Panteleris*, the Sixth Circuit affirmed the district court's refusal to set the date of wrongful removal before the date on which mother communicated to father that she would not return the children, absent evidence of some earlier conversation. *Id.* Without communications from Zank or his family to Lopez Moreno, *Panteleris* does not provide much guidance.

The Court must instead analyze the available circumstantial evidence to determine when Zank's retention of BLZ became wrongful. Zank bears the burden of proving that his retention became wrongful on or before August 14, 2016 to proceed with his Article 12 defense. 22 U.S.C. § 9003(e)(2)(B). This is necessarily a fact-intensive inquiry. To that end, the Court has had the benefit of taking both parties' testimony twice and has evaluated the credibility of each. The Court now considers that testimony, along with the stipulated facts and the documentary evidence presented, to determine if Zank has shown that Lopez Moreno's petition was not timely filed.

---

[2] The Court acknowledges that Lopez Moreno cites this case to support the theory that the date of wrongful retention is the date on which the abducting parent explicitly makes clear that the child would be separated from the left-behind parent. However, the *Blanc* court's holding that unequivocal statements are required was in the context of determining whether the child's *habitual residence* could be changed by one parent's ambiguity, not whether the date of wrongful retention could be changed by such ambiguity. *Blanc*, 721 F. Supp. at 761.

8

There exists one concrete date from which the Court can begin its analysis with confidence: the expiration of BLZ's travel authorization on August 15, 2019. It is clear that Lopez Moreno consented to BLZ remaining in the United States until that date, and when BLZ did not return to Ecuador on August 15, Lopez Moreno should have known that BLZ would not return. Thus, August 15 is a firm end date: the Hague Convention's proverbial clock began to run no later than August 15, 2016.

However, the travel authorization does not easily answer the question of when Zank's retention became wrongful, because the document only considers Lopez Moreno's consent to BLZ travelling between the United States and Ecuador. The subtle but important distinction is that the travel authorization does not speak to Lopez Moreno's consent to BLZ remaining with Zank. *See, e.g, Giles v. Bravo*, No. 2:11-cv-01600-PMP-CWH, 2012 WL 704910 (D. Nev. Jan. 27, 2012) (holding that retention becomes wrongful if the left-behind parent's consent expires, which may happen even while a travel authorization allows the child to physically be with the retaining parent). Lopez Moreno's consent for BLZ to be with Zank expired sometime before August 15, as evidenced by Zank's testimony that "his time [with BLZ] was ending on the ninth," and the family's plans for BLZ to enter Fernando's care and custody *before* August 15. Given these facts, the travel authorization does not extend Lopez Moreno's consent for BLZ to remain with Zank all the way to August 15, 2016: her consent for the child to remain with Zank expired sometime before the 15th. Therefore, the travel authorization itself does not easily answer the question of when Zank's retention became wrongful.

9

The pleadings Zank filed in Montcalm County Court on August 10, 2016, are of little value to the Court, because Zank failed to provide that court with Lopez Moreno's contact information. Lopez Moreno was not made aware of these proceedings, nor did she receive copies of Zank's pleadings or the Court's orders. Accordingly, none of these documents change the calculus of when Lopez Moreno knew or should have known that BLZ would not return.

Thus, the tumultuous circumstances in early August 2016 must be examined. The events unfolded against a backdrop of fear and deceit: Lopez Moreno was concerned that Zank might wrongfully keep BLZ in America, likely because she had wrongfully taken BLZ to Ecuador in December 2009. While Lopez Moreno's past actions are immaterial to the instant analysis, they provide context for the parties' relationship: Lopez Moreno harbored this fear for some time, as evidenced by her not allowing BLZ to travel to the United States before 2014, and not before she secured an Ecuadorian Court Order authorizing that travel. This context is important: Lopez Moreno was aware of the risk of wrongful retention.

On August 9, 2016, BLZ did not arrive in Florida. Both Lopez Moreno and Fernando were made aware of this by a member of Zank's family, and by the simple fact that BLZ never showed up at the Orlando airport. BLZ's desire not to return led to the phone call from BLZ to Lopez Moreno. It is unclear when this phone call occurred, but giving Lopez Moreno the benefit of the doubt, the Court assumes the phone call from BLZ took place the following day, August 10, 2016. At that point, Lopez Moreno knew that BLZ had not made it to Florida for the vacation, and that she had stated that she did not want to return to Ecuador.

Then, Lopez Moreno began calling the Zank family, each time to no response. This was highly unusual: Lopez Moreno testified that she had never had issues contacting BLZ before August 2016. Given the abrupt change in circumstance, Zank's decision to ignore all of Lopez Moreno's calls, and Zank's apparent instruction to have his family members ignore all of Lopez Moreno's calls—particularly against the backdrop of Lopez Moreno's fear that BLZ might not return—Lopez Moreno should have known within 24 hours of frantic, unanswered phone calls that BLZ would not be returning.

This is particularly palpable because if a return flight had been scheduled, it is reasonable to infer that communication would have continued: someone would have had to pick BLZ up from the airport in Orlando and schedule her a flight from Orlando to Ecuador. Without that communication, a reasonable person in Lopez Moreno's shoes should have understood that BLZ was not returning to Ecuador. Further, Lopez Moreno seems to have known that BLZ would not return, as evidenced by her contacting the police, child protective services, and an attorney before August 14th. The Court concludes that she sought to act using means available to have BLZ forcibly returned, evidencing a knowledge that Zank would not return BLZ of his own free will.

In light of BLZ's failure to appear in Florida; the phone call from BLZ; Lopez Moreno's inability to contact Zank, his family, or BLZ; Lopez Moreno's fears of retention; and her attempts to act on that fear by contacting Ecuadorian authorities, it is clear that Lopez Moreno knew, or at least should have known, from all the facts and circumstances that BLZ would not be returning to Ecuador. Thus, the Court finds that within 24 hours of the phone

11

call—so no later than August 11, 2016—Lopez Moreno should have known that BLZ was not returning to Ecuador.

### IV. Conclusion

For these reasons, Lopez Moreno's August 14, 2017 petition was not timely filed. Therefore, she is not entitled to BLZ's automatic return to Ecuador on this defense.

**IT IS SO ORDERED.**

Date: April 23, 2020                               /s/ Paul L. Maloney
                                                   Paul L. Maloney
                                                   United States District Judge

12